By the Court.—Freedman, J.
The court below found, upon evidence somewhat conflicting, that deceit had been used for the purpose of bringing defendant within the jurisdiction of this court. We have carefully examined the evidence, and deem it amply sufficient to sustain such finding. The service of the summons was therefore properly vacated and set aside (Carpenter v. Spooner, 2 Sandf., 716).
The order must be affirmed, with costs.
Monell and Curtis, JJ., concurred.

 In Lagrave’s Case (Supreme Court, First District, at Chambers and Special Term, July and September, 1878), the rule that a party brought within the jurisdiction by requisition on a criminal charge, made with the design of bringing him within the jurisdiction that he might be held to bail in a civil action, is not liable to arrest in a civil action, at the suit of those who caused him to brought within the jurisdiction—was applied where the creditors combined and contributed, not to collect their claims, but for the purpose of bringing the fugitive to justice and punishment, and the requisition in extradition was obtained by an officer employed by their committee, and, on his subsequent arrival, some of them brought the civil actions in which he was then arrested.
In such cases the prisoner may resort to habeas corpus and certiorari; and, although the order of arrest be valid on the face, may show these extrinsic facts which entitle him to his discharge.
But the rule as to abuse of process does not preclude criminal proceedings against the person thus brought into the jurisdiction; nor does it prevent the service of summons in a civil action at the suit of a creditor who was not connected with the proceedings by which he was brought within the jurisdiction.
I. July, 1873. Alfred E. Lagrave was brought before Mr. Justice Farcher on writs of habeas coipus and certiorari, under circumstances fully stated in the opinion.
*334 John Graham, B. T. Gerry and Ambrose Monell, for petitioner.
A. Oakey Hall, for the sheriff.
Wm. Allen Butler, for the creditors.
Fancher, J.—The defendant had not, as the proofs show, committed any crime for which, under the treaty between the United Statés and France, he could be demanded by the one government or extradited by the other. The treaty of February 84, 1845, provides for the demand by one power and the surrender by the other, of persons accused of certain crimes. One such crime is “ burglary,” which is defined to be the breaking into a mansion house by another, by night, with intent to commit felony. The crime is included, under the French law, in the words ml gualifie (8 U. S. Stat. at L., 582, 617; Whart. Confl. Laws, 942). The offense of burglary is a common law offense., It is essential to the crime that the house broken into be a dwelling-house, and that the time of entering be in the night (3 Chitt. Crim. Law, 1101, 1102).
The relator was charged and indicted for an offense, which, by our New York statute, is defined as burglary in the third degree (2 Rev. Stat. 669, § 17). This is only a statutory offense, and was not known to the common law. The indictment against the relator, of August 12, 1872, was for this particular statutory offense, defined as burglary in the third degree. There is no averment that he broke into a dwelling-house, nor that the time of the act was in the night. It is doubtful if the offense, as charged, could be sustained under the facts disclosed (People v. Fralick, Hill & D. Supp., 63) ; but whether the facts will make out the statutory offense or not, it is quite certain the common law offense of burglary is not charged, nor docs the indictment allege it, nor does the treaty between the United States and France provide for the demand and extradition of a fugitive for our statutory offense of burglary in the third degree. The treaty refers to the common law offense of burglary.
If no offense within the treaty was charged, time need not be spent in rehearsing the facts and circumstances touching the extradition of the relator, and the bringing of him forcibly from France to the United States. It is plain the proceeding was unauthorized and illegal. He was wrongfully seized and kidnapped in France, through the instrumentality of James Mooney, an alleged detective, and by him was forcibly brought to the United States on the French steamer “ Washington,” without any charge haying been made, for which he could lawfully be extradited. I
It must be conceded, that if the creditors, who procured and caused *335 to be served on tlie relator, orders of arrest in civil actions, are responsible for the seizure of the relator on French soil, and for his extradition to the United States, there has been, according to the. principle of several well-considered authorities, such an abuse of process as will require the court to set aside tte arrest. But the counsel for the creditors has strenuously contended, that none of the creditors nor their committee had anything to do with the criminal charge for which the relator was indicted, nor with the proceeding or instrumentality by which he was brought from France to the United States. On the other hand, the relator, and his counsel, assert that the creditors- and their committee, and they only, had all to do with the getting up of the criminal charge, and with the so-called extradition proceedings. Upon the determination of this disputed issue depends one of the principal questions in the case.
There is no doubt that the United States minister in France acted upon misinformation when he allowed the authority of his office to favor the relator’s extradition. The indictment, and the affidavit of Tafft, on which it was found, were insufficient to show any crime for which the defendant could be extradited. The affidavit of Tafft alleged that the offense was committed in 1871; the indictment averred that it was committed in 1873. But neither the one nor the other made out the common law offense of burglary.
The “decrete” put in evidence, is dated on September 33,1873; and the relator appears to have been arrested on September 9, fourteen days before. The arrest, therefore, was not because of, nor founded upon the authority of, the decrete; but the latter must have been procured as ancillary to the arrest, and because it was proper the French authorities should take action in their own tribunals, so that the decrete should operate as a warrant of extradition. The French authorities were in some way beguiled into the belief that the relator was accused of a crime within the international treaty, for the decrete assumes that the offense charged was within the treaty.
There is an act of Congress (15 U. S. Stat. at L., 337) which provides that “ any person duly appointed as agent to receive, in behalf of the United States, the delivery by a foreign government of any person accused of crime* committed within the jurisdiction of the United States, and to convey him to the place of his trial, shall be and thereby is vested with all the powers of a marshal of the United States in the several districts through which it may be necessary for him to pass with such prisoner, so far as such power is requisite for his safe keeping.” But if the custody which Mooney exercised over the relator was unlawful in the beginning, the statute of the United States, just quoted, could not make the custody lawful afterward.
*336 While on the steamer, which was a French vessel, the prisoner, in contemplation of law, was on French territory. Ships and vessels on the high seas are treated as a part of the territory of the country to which, according to their nationality, they belong (Case of Atlanta, 8 Opin. Atty.-Gen. U. S., 73 ; In re Bennett, 11 Law Times R. N. S., 488 ; Queen v. Anderson, Law Rep., 1 Crown Cas., 161 ; Reg. v. Jennot, 1 Russ. on Crimes, 4 ed., 153 ; Arch. Cr. Pl., 16 ed., 395; Reg. v. Allen, 1 Moody Crown Cas., 494 ; Thomas v. Lane, 2 Sumner, 1 ; United States v. Coombs, 12 Peters, 72).
There was no arrest of the relator, therefore, which was lawful, until he reached the jurisdiction of blew York; and the question is, was he brought here under such circumstances as to make his arrest, when here, an abuse of process ?'
The principle of law applicable to the case is to be found in several authorities. There are adjudications on the subject both in England and the United States. They all illustrate the same principle. An arrest procured by fraud or trick is illegal.
Where a party was brought from another State by virtue of a requisition from the governor on a criminal charge, and it appeared that the charge was made with the design of bringing such 'party within the jurisdiction of the court, that he might be held to bail in a civil suit, he was ordered to be discharged from arrest on common bail (Underwood v. Felter, 6 N. Y. Legal Obs., 66). Other cases are to the same effect (Stein v. Valkenhuysen, Ellis, Blackburn & Ellis, 65 ; Wells v. Gurney, 8 Barn. & Cress., 769 ; Goupil v. Simonson, 3 Abb. Pr., 474 ; Snelling v. Watrous, 2 Paige, 314 ; Williams v. Bacon, 10 Wend., 636 ; Benninghoff v. Oswell, 37 How. Pr., 235 ; Hill v. Goodrich, 32 Conn., 588).
In one of these cases it was said, that where a party has not, in fact, been guilty of a crime, a proceeding founded on the allegation that it was committed, which is a mere device to enable an arrest, is an abuse of process, and the arrest cannot be sustained. The legality of the arrest is, therefore, to be tested by the inquiry, whether the creditors were concerned in the device by which the party has been brought within the jurisdiction of the court. If the criminal proceeding be a pretext to bring him within the jurisdiction, so that he may be proceeded against cimliter, and the creditors, in whose suits the orders of arrest were issued, instigated the criminal proceeding and were instrumental in bringing the relator where the orders of arrest could be served, then the arrest was unlawful and cannot be maintained.
The counsel on both sides have substantially concurred in the principle of law applicable to the case, but they differ when the question of *337 fact is raised as to the interference of the creditors in respect of the criminal charge and the extradition. To determine this question we must look at the facts as disclosed by the evidence in this matter.
Le Grave was a dealer in dry goods in the city of New York. In 1871, he had a place of business at 524 Broadway, and in 1872, at 448 Broome Street. In the early part of 1872, he made large purchases of goods upon credit from leading importers in the city. On Sunday, the 26th June, 1872, he secretly absconded without paying or providing for his large indebtedness.
Shortly after his flight became known, his New York creditors held a meeting at the office of Messrs. Alden & Co., 530 Broadway, when a committee was appointed. There were two subsequent meetings of the creditors at the St. Nicholas Hotel. The creditors then were ignorant of his whereabouts ; and the testimony bears out the assertion of their counsel, that “the object of the appointment of the committee was, not the collection of the claims of creditors, but to ascertain where Lagrave was, and, if possible, to procure his arrest and bring him to justice and punishment.”
An agreement was made between themselves at the first meeting of the creditors to pay five per cent, on the several amounts of their respective claims; and, at the second meeting, they instructed their committee to put Lagrave in bankruptcy, and “take such steps as would bring him to punishment.”
It appears that six or seven thousand dollars were realized from the first subscription of five per cent. Afterward, in September, there was another meeting of the creditors at the St. Nicholas, when it was stated that the relator had been arrested at Luchon, in France, that the funds of the committee were exhausted, and, if the creditors saw fit, they could furnish them with more money. A further assessment of three, per cent, was assented to, and paid.
Several of the creditors testify that the object of appointing the committee, was to bring this man, Lagrave, to justice. The creditors generally united in the appointment of the committee, and agreed to the pro rata contribution to pay the expenses which might be incurred.
The committee retained as their legal adviser, John D. Townsend, Esq.; and, in accordance with his advice, James Mooney was selected as a competent detective to find Lagrave. Mooney went to France in search of him. His instructions were to find him, if possible. It is not disputed that the expenses of Mooney were paid by the committee, out of the fund contributed by the creditors. Mooney testified that he was employed to ascertain the whereabouts of Lagrave. One of the creditors, Mr. N. 8. W. Yanderhoef, testifies, that the com *338 mittee was appointed to take the business in hand and prosecute, instead of each individual creditor looking after his own interest-^ to prosecute Lagrave for thieving from his creditors. That was the motive. The money, and who they should employ, were left entirely with the committee. The particular proceedings, he says, were left to the committee. William Strong, the treasurer of the committee, states that the committee put the whole case into the hands of Mr. John D. Townsend, about the first of June, for. the purpose of arresting and punishing Lagrave, if possible. He further says, “We put the whole matter into Mr. Townsend’s hands, and we were to pay the cost of the thing.” The money was expended, under his instructions, in the costs of the whole case. He called for money frequently by orders on Strong. Others of the committee relate the same facts as to the employment of Mr. Townsend, and confiding the whole case to his hands.
In one of the interviews of one of the committee with Mr. Townsend, the latter said he had heard of a case of burglary at Thayer’s store, and he presumed that was sufficient to bring’ him (Lagrave) out here. Mr. Field, one of the committee, testifies, p. 315: “We understood that Mr. Townsend was to have him brought back on that charge.” In September following, Mr. Field learned from Mr. Townsr end that an indictment had been procured ;—-he said, one had been procured “for the purpose of arresting and bringing him back.”
Mooney swears that Mr. Townsend employed him to go abroad .in this matter about ten or twelve days before he went. This makes the date of the employment about June 5, 1873. He received money from Townsend, and left for Liverpool, on June 15, 1873, with a description and photograph of Lagrave, instructions from Townsend, and two hundred and twenty-five pounds in money. While he was abroad letters and telegrams passed between him and Townsend. ■ ■
All these steps, thus far, were taken by the creditors, their committee and counsel, nothing is heard of any public officer or criminal proceeding, until after Mooney had arrived in France.
By the minutes of the grand jury, of August 13, 1873, it appears that an indictment was found, on that day, on the evidence of George H. Tafft, against Alfred E. Lagrave, and' James D. Otis, for burglary in the third degree. Mr. Townsend testifies in this matter, that it is very possible he did draw the original affidavit of George H. Tafit— that he did draw the affidavit of one person and delivered it to the district, attorney; cannot say whether it was Tafft’s or Bassett’s. The district attorney remembers Townsend spoke to him about the case, but cannot say whether before or after the indictment. He says there was a conversation with Townsend, which must have been after the *339 indictment, about claiming Lagrave from the French government under the treaty. A letter was prepared by his clerk, or by Townsend, to the secretary of state.
The indictment charged that Alfred E. Lagrave, on June 4, 1872, with force and arms, the store of Davis Thayer, Jr., feloniously and burglariously did enter and break into, then and there burglariously to steal and carry away certain cases of hats. The affidavit of Tafft relates how certain hats were missed from the store of Thayer, in June, 1871, and that one Tomlins, an employee of Lagrave, had informed him the missing goods had been found in the premises of Lagrave; and the affidavit contains other allegations of circumstances implicating La-grave in the theft of the hats; and concludes by stating that, as deponent is informed, it is the desire of Thayer that Lagrave should be prosecuted, and “ that said Lagrave is now a fugitive in France.” According to an indorsement on the indictment, Thayer was in Massachusetts. Tafft went to France and, as the relator testifies, he said that Bassett came to him and wanted him to go before the grand jury. He went, and John D. Townsend was there. The relator denies or explains the facts asserted in Tafft’s affidavit as to the alleged burglary. Mooney states that he was present at Luchon, in France, with the chief of police, some police officers, and a detective from Toulouse, when Lagrave was arrected, and that the chief of police and detective made the arrest. The prefect of police retained charge of the prisoner until October 14, when Mooney took charge of him. Mooney states that the arrest at Luchon was for burglary in Hew York on a man named Thayer. After the arrest, Lagrave was takes’ to Paris; from thence to Brest, where he was placed on the French steamer “ Washington,” and where, on October 14, 1872, Mooney took sole charge of him. Mooney’s authority for keeping him in custody and bringing him to the United States, was a decrete in French, dated September 27, 1872; a letter of Minister Washburn, dated October 11,' 1872, and the verbal authority of Minister Washburn.
Mooney testifies that he told Minister Washburn he was directed by Townsend to go there and find Lagrave. He paid the expenses of Lagrave from the time he took him in custody until the arrival of the “Washington ” at Hew York, on October 26, 1872. The amount for his own services and expenses was four or five thousand dollars.
Some of the creditors learned through Townsend, some from one of the committee, and some from other sources, that Lagrave bad been arrested, and was being brought to Hew York on the “Washington,” and they then applied to their lawyers, who procured orders of arrest. The orders of arrest were procured immediately on his arrival in Hew York. Lagrave was first taken to the district attorney, and then to the sheriff, where the orders of arrest were served.
*340 This general outline of facts, without going into more particulars, shows plainly that the committee of the creditors, and primarily the creditors themselves, were the parties who caused the arrest and ex-tradi tion of Lagrave. Had he not. defrauded them,, no meetings of creditors would have been held, no subscriptions made, no committee appointed, no counsel employed-, no affidavit drawn for the grand jury, no indictment found, no detective engaged, and no arrest or extradition achieved. Hor would the relator have been pursued or brought .to the United States, but for the money which the creditors paid and caused to be applied for the purpose. He may not have been overtaken with anything exceeding his deserts. He fraudulently contracted the debts which he owes the creditors, and he absconded as a fraudulent debtor. But those are facts that cannot legally excuse a device to bring him into the jurisdiction of the court for the purposes of arrest in civil actions, if the device has no meritorious foundation.
The arrival of the steamer was announced, and before Lagrave had been loosed from the confinement and arrest, begun in France, continued on the voyage to the United States, and still enforced when he was taken from the vessel to the district attorney and to the sheriff’s office, the orders of arrest were served. He has since been in the custody of the sheriff, and in confinement.in Ludlow Street jail, for want of bail, on the orders of arrest.
How, had all these facts appeared before the court, on motions, made in the several actions wherein the orders issued, to set aside the service of the orders of arrest, on the ground of abuse of process, I cannot say the motions should not prevail. But the application before me is not a motion in any of the actions. It is made in-the proceeding instituted by the writs of habeas corpus and certiorari; and the question arises whether I can go behind the return which sets forth regular orders of arrest and the detention, by the proper officer, of the relator thereon ?
Section 39 of the habeas corpus act provides, that “if no legal cause be shown for such imprisonment, or 'for the continuance thereof, such court or officer shall discharge such party from the custody or restraint under which he is held.” 2 Edm. Stat., 688 (same as § 54, in 3 Rev. Stat., 5 ed., p. 887). But, in this case, “ legal cause ” for the imprisonment and restraint, it is contended, is shown in the orders of arrest which are set forth in the return.
It is provided by section 41 of the habeas corpus act, that if the prisoner be in custody on civil process from any .court legally constituted, or issued by any officer in the course of judicial proceedings before him, authorized by law, such prisoner can only be discharged in one of the six cases mentioned in the statute.
*341 It must be conceded that the orders of arrest, granted by a justice of the supreme court, were issued by an. officer having jurisdiction; and, also, that the facts constituting the cause of arrest were sufficient for the exercise of the officer’s discretion to issue the orders. They are likewise sufficient on their face, being in due form, and, con-consequently, are a sufficient protection to the sheriff. The imprisonment is, therefore, lawful, until the arrest is set aside (People v. Nevins, 1 Hill, 154 ; People v. McLeod, 1 Hill, 377 ; S. C., 25 Wend., 483 ; People v. Cassels, 5 Hill, 168 ; Matter of Prime, 1 Barb., 340 ; Matter of Clark, 9 Wend., 212 ; Sheriff of Middlesex, 11 Ad. & El., 273 ; Exp. Kearney, 7 Wheat. 38.
The case is one where the relator is in custody on civil process issued by an officer in the course of judicial proceedings before him, authorized by law; and it is contended by the creditors, that unless it appear that the case falls within one of the six subdivisions in section 41, it is the requirement of the statute that the relator sliallbe remanded.
The counsel for the relator claim, however, that relief can be had in this proceeding, and they cite section 52 of the habeas corpus act (2 Rev. Stat., 570; vol. 3, 5 ed., p. 889, § 69), which reads as follows: “ If it appear that the person detained is illegally imprisoned, confined, or restrained of his liberty, the court or officer shall grant a writ of discharge, commanding those having such person in their custody to discharge him forthwith.”
In People ex rel. Ritterman v. Kelly, 1 Abb. Pr. N. S., 432, the late city judge discharged the relator on habeas corpus, where it appeared by the return that he was in custody under nine orders of arrest; but in respect of which it was shown, on traverse to the return, that the causes of action arose prior to his discharge as an insolvent debtor.
There are various other authorities bearing upon the question, the"' most prominent of which are these: Exp. Beatty, 12 Wend., 229 ; Squire’s Case, 12 Abb. Pr., 38 ; Caldwell’s Case, 35 Barb. 444 ; S. C., 13 Abb. Pr., 405 ; People ex rel. Burroughs v. Willett, 26 Barb., 78 ; People v. Rawson, 61 Barb., 625 ; Bennac v. People, 4 Barb., 31.
In Squire’s Case, 12 Abb. Pr., 38, it was held that if the prisoner was arrested in violation of his privilege, he was entitled, on habeas corpus, to his discharge. The party, in th at case, was exempted from arrest under the metropolitan police act.
There is another section of .the habeas corpus act, which, it seems to me, bears upon the case, although it has not been referred to by counsel. Section 48 (2 Rev. Stat., 569, vol. 3, 5 ed., p. 889) provides that the party may allege any fact to show, either that his imprisonment or deten *342 tion is unlawful, or that he is entitled to his discharge; and thereupon, the court or officer is directed to proceed in a summary way to hear the proofs and allegations, “ and to dispose of such party as the justice of the case may require.”
This provision is so broad that it seems to confer ample authority on habeas corpus and certiorm'i, not only to inquire into the cause of the imprisonment and detention, but to hear all the facts touching the same, and to dispose of the party as the justice of the case may require.
In 3 Hill, note, pp. 647, 666, it is said: “If the party be illegally arrested or detained, though the process be valid, this is ground for discharge.” Authority for this proposition is cited, in Pleasant’s Case, 11 Am. Jur., 257, where the party was discharged on habeas corpus, because the arrest had been made without the territorial jurisdiction of the court.
Although motions to set aside the service of the orders of arrest could be made in the several actions wherein they were issued, still, I am of the opinion, that the party arrested may resort to habeas corpus and certiorari, and, in that proceeding, may show any facts which entitle him to his discharge, and the court or officer before whom the proceeding is brought, is bound summarily to hear and adjudicate upon the facts, and to dispose of the party as the justice of the case may require.
Where the arrest or detention is illegal the right of the party to his discharge is absolute; and it was not intended that he should be compelled to resort to any other proceeding to procure it than the proceeding on habeas corpus and certiorari (See People ex rel. Burroughs v. Willett, 26 Barb., 78 ; Caldwell’s Case, 13 Abb. Pr. 405 ; S. C., 35 Barb., 444 ; People ex rel. Ritterman v. Kelly, 1 Abb. Pr. N. S., 431.
The -result of these remarks is, that the relator was not legally arrested on the several orders of arrest mentioned in the return; and, so far as he is imprisoned or detained because of them, he is entitled to his discharge.
But there is another cause of detention set forth by the respondent in his return, for which I think the relator must be remanded.
The return of the sheriff sets forth, that he arrested the relator and took him into custody, under and by virtue of certain orders of arrest, copies of which are annexed to the return; and that he holds and detains said relator in custody by virtue of said orders; and, also, by virtue of a certain warrant issued by the People of the State of New York, a copy of which is also annexed to the return.
The warrant is a bench warrant issued by the district attorney for the County of New York, commanding the sheriff, &c., to take the *343 body of Lagrave, who stands indicted for burglary, and to bring him. before the justices of the general sessions of the peace, in and for the City and County of New York, to be dealt with according to law.
"Where a prisoner is without the jurisdiction of the court, and is by force or fraud brought within it, he cannot be arrested and proceeded against in a-civil action, at the suit of any party concerned in bringing him within such jurisdiction. But, in respect of a criminal offense, this rule has no application (Scott’s Case, 9 Barn. & Cress., 446 ; People ex rel. Luddington v. Sheriff of N. Y., MSS., Fithian, J.).
It is no ground for discharging a prisoner from arrest in a.criminal matter, that he has been forcibly brought within the jurisdiction (People v. Rowe, 4 Park. Cr., 253).
In the civil actions, the improper proceeding of the plaintiffs which would amount to an abuse of process, is a legal wrong which prevents them from retaining the benefits of an arrest. But there can be no wrong of that nature imputable to the People. The process upon which he is held, issued by the district attorney, is valid; and the court or officer cannot, on habeas corpus or certiorari, inquire into the truth of the crime for which the prisoner stands indicted (People v. McLeod, 1 Hill, 377; Matter of Clark, 9 Wend., 212). The question of his guilt or innocence must be tried according to law (2 Rev. Stat., 733, § 1).
It is argued that he cannot be tried, because the indictment is lost. Perhaps the public prosecutor may be able to substitute a copy of the indictment (People v. Burdock, 3 Caines, 104). The indictment canribt be questioned collaterally (People v. Hurlbut, 4 Denio, 136 ; Bank of U. S. v. Jenkins, 18 Johns., 309).
It is farther alleged that there is no intention to try the relator on the indictment, and that the time which has elapsed since the warrant was delivered to the sheriff entitles him to be discharged. That may be true; but the motion for a discharge on such grounds must be made to the court wherein the criminal proceeding is pending. That court has full control of the indictment and of all proceedings founded upon it.
The relator must be discharged from the orders of arrest in the civil actions; but remanded to the custody of the sheriff on the warrant issued on the indictment in the general sessions against Mm, with directions to the sheriff to take the relator before that court to answer the indictment.
II. September, 1873. H. F. Averill, a creditor who did not participate in the proceedings which resulted in bringing the prisoner into the jurisdiction, brought a separate action against him, and the sum *344 mens having heen served on him. the defendant now moved to set the same aside.
Charles W. Brooke, for the motion.
Thomas Allison, opposed
Daniels, J.—The defendant appears to have been fraudulently brought within this State by.virtue of proceedings taken for his extradition' under the treaty existing between France and the United States. The offense for which he was extradited was not one for which that proceeding was provided by the treaty. He was accordingly brought unlawfully within this State. But the plaintiff was in no manner connected with that unlawful proceeding. He, therefore, is in no sense responsible either for the fraud or any of its consequences, and for that reason should not, because it has been perpetrated by others, be deprived of any of the rights or remedies which the law, under ordinary circumstances, has provided for creditors in the way of securing the collection of their debts. Persons who are concerned in unlawful or fraudulent proceedings, by means of which others are indubed to place themselves within the jurisdiction of the courts of this State, When they would not otherwise have done so, will not be permitted to profit by their fraud or wrong so far as to be allowed to enjoy the advantages of that jurisdiction over the individuals deceived by them. The law will not sanction fraudulent or wrongful proceedings, and, for that reason, it deprives the party taking them of all the advantages he attempts to derive from them. He cannot avail himself of process that can only be rendered serviceable as a triumph of his fraud (Snelling v. Watrous, 2 Paige, 314 ; Carpenter v. Spooner, 2 Sandf., 716 ; Metcalf v. Clark, 41 Barb., 45 ; Benninghoff v. Oswell, 37 How. Pr., 235 ; Williams v. Bacon, 10 Wend., 636). In all these cases, except the last one, the process was set aside because it was issued in favor of a person participating in or perpetrating the fraud. Neither of them held that a creditor not implicated in the wrong could not proceed against a debtor brought by means of it within the jurisdiction of the courts of this State; and, as long as by proceeding,- he imposes no restraint upon the person of the debtor, no good reason appears for depriving him of the remedies the law has declared him entitled to in securing satisfaction for his debts.
In the present instance the debtor has the right to return unrestrained to the country from whence he has been unlawfully extradited. But the simple service of a summons requiring him to *345 answer the allegations of the creditor, imposes no restraint whatever upon his person. His liberty in that respect is as complete as though no such service had been made. And the service, therefore, is in conflict with no right or privilege which the defendant can properly claim.
The decision made upon the proceedings taken for the removal and detention of the defendant was urged hpon the argument as in conflict with this conclusion. But an examination of it discloses nothing' denying the right of an innocent party to proceed against his debtor by a mere summons, where his person may have been brought within the jurisdiction of the court by the wrongful act of others; and upon a similar motion by the same debtor, it was held in the Court of Common Pleas, that, as to innocent parties he was subject to the service of such process.
The right of the creditor to proceed against his debtor has been always maintained with great firmness and consistency. Where the proceedings were untainted with artifice, fraud, or wrong, for that reason the service of process upon persons convicted and imprisoned for criminal offenses has been sanctioned, even where the confinement and restraint was of such a nature as to prevent the defendant from presenting legal defenses existing in his favor (Phelps v. Phelps, 7 Paige, 150 ; Davis v. Duffie, 1 Abb. Ct. App. Dec., 486 ; S. C., 4 Abb. Pr. N. S., 478.) Where neither the artifice, fraud, or other misconduct of the creditor has induced the defendant to place himself within the jurisdiction of the courts of this State, the only cases in which they have protected him from the service of a simple summons are those relating to foreign witnesses attending voluntarily to give their evidence; and such persons have been held exempt from all process involving them in litigation on grounds of public policy, it being deemed essential to the proper administration of justice to encourage and induce foreign witnesses to attend and give their evidence in person, instead of having it taken by the way of deposition (Seaver v. Robinson, 2 Abb. Pr., 554 S. C., 3 Duer, 622 ; Pollard v. Union Pacific Railroad Company, 7 Abb. Pr. N. S., 70.) When the defendant has been brought into this State as a fugitive from justice, under the constitution and laws of the United States, it has been held that he may be proceeded against by civil process after his trial and acquittal on the criminal charge, provided the extradition proceedings were not used to subject him to the civil proceedings of the courts. (Williams v. Bacon, 10 Wend., 636.) That is a direct authority for the present proceeding; for it sanctions and sustains the right of an innocent party to proceed against his debtor who may have been brought into the United States under extradition proceedings.
*346 In principle, there can he no practical difference between the case of a fugitive brought from a neighboring State under the constitution and laws of the United States, and one brought from a foreign country under the provisions of its treaties. In each the right of freedom to return is precisely the same, and the implied guarantee of that right under the laws is no greater in one case than it is in the other; and as the process sefVed in this action did not interfere with the full and complete exercise of that right by the defendant, and the plaintiff was in no sense whatever implicated with the parties in improperly securing his return to this country, the present motion must be denied, with ten dollars costs.